Lunsford v. Administrator New Jersey State Prison 21-2134 Good morning, Ms. Tubbs. Good morning. May it please the court, I'm Stephanie Tubbs from Fakery Drinker. I and my colleagues from Decker are pro bono counsel for Mr. Lunsford. If I may, I'd like to reserve three minutes for rebuttal. Sure. Thank you. Let me be really candid with you here. It seems to me this is a horrible identification. It should never have been let into evidence, but it was let into evidence. The police procedure, just sharing my own thoughts about the case, not what we've decided. We haven't decided anything. You don't have any police misconduct with the arguable exception of the response when the witness hesitated over looking at one photo. But the instructions that were given that photo array process were almost textbook. The guy was not told he had to pick somebody out or that the suspect was in the photo spread, which is key, it seems to me. And they then showed, he then showed the other photos sequentially. You've got what was said in prairie by the U.S. Supreme Court saying that identification procedures don't arise under the due process clause absent some kind of police misconduct. You don't have those kinds of variables here. System variables, I don't think, work for you here. It has to be the estimated variables. Again, this idea should never have been let in, but it was. You have our statement in Johnson basically saying that we're not here to correct constitutional dimensions. So it comes down to me, it seems, as to whether or not counsel could be Sixth Amendment constitutionally defective for not trying to suppress this identification. The problem with that is you may have lost a discretion hearing and the judge may have said it's a jury issue. You let the jury see the photo spread and then you make your argument to the jury. Maybe they'll say it's a good idea, maybe they won't. But how does that get us any kind of basis to give you habeas relief? Well, thank you, Judge McKee. First of all, the procedure was suggestive. The transcript of the witness's second statement, and we can talk about the record issues in this case, shows that there were leading and suggested questions prior to even showing any photographs. Prior to the ID procedure beginning?  And that's not on the record? It's in the transcript of the witness's second statement, which was used as an exhibit at trial. It was marked by the state. However, no counsel took the technical formal step of moving it into evidence. That's the only difference between that transcript and the photo array itself, which this court requested and is now in the record. And was that statement by the same detective who showed the photo spread? I'm sorry, say that again? Was that statement, those statements, by the same detective who showed the photo spread? No, Your Honor. They were all by Detective Diaz, who was working the case. Who knew who the suspect was? Who knew who the suspect was, who built the photo array specifically to include Mr. Lunsford's photograph. And then also, so those leading and suggestive... What were those statements? The statements? They were confidence-boosting, I will say, and they... That's the conclusion. What were they? What were the statements? So, they said, you described him, you know... Who's they? I'm sorry, Detective Diaz said to the eyewitness, you stared straight at him. Since you described him, you know pretty much in detail, you think he would be able to identify him. He was pretty close to you. Can you, you were staring straight at him. You could see there was perfect daylight. You were looking directly at him. Those were the types of questions that Detective Diaz asked prior to the eyewitness even looking at any photographs. Once the witness started looking at photographs, they were shown sequentially, which comports with the New Jersey Attorney General's guidelines. However, when Detective Trogani got to the third photograph, and only for the third photograph, which was Mr. Lunsford's, he said, you recognize him. Now, Trogani said at trial that he did that because the eyewitness paused. There's no indication from this transcript that there was any pause. Was Diaz in the room? I believe he was not, Your Honor, just according to the transcript. But after Detective Trogani said you recognize him, he said, how do you recognize him? So he gave that non-leading question, and then Mr. Kight gave kind of a long answer, you know, he looks very, very close, and so on. So even if we think that the you recognize him question was not ideal or problematic, why would we be convinced that this was a suggestive process given Kight's response to the open-ended question and follow-up? Well, it's questionable whether the eyewitness would have even provided that information unless Detective Trogani had prompted him to provide that information by saying you recognize him. Now, to Judge McKee's earlier point to the difference between system variables and estimated variables, the system variables here include the fact that detectives built this photo array around an old photograph of Mr. Lunsford, one from 2007 rather than 2008. But arguably that helps you because it reduces the chances of an identification. If it doesn't, if the The issue is that the photographs of Mr. Lunsford from 2008 show that he had a full beard throughout 2008, and the eyewitness, the only thing that's consistent across his descriptions of the man with the gun, I won't say shooter, the man with the gun, is that he's clean-shaven and has a Caesar haircut. But again, that helps you. They're giving him a photo that doesn't look like the guy, and he gets picked out anyway. I'm not sure how that's suggested. You'd think he'd want a little photo that doesn't look like him. So the 2007 photograph, in that photo, Mr. Lunsford is much younger. He's 17, 18. It's more than 14 months before the actual photo array in this case. But also he is basically clean-shaven. It's difficult to tell from the photo array. But in that photo, it looks like he may have a light mustache. And so he's closer to the witness's description of the shooter, or of the man with the gun, excuse me, than Mr. Lunsford's actual appearance in 2008. Now, as we noted in our briefing, Mr. Lunsford was arrested in July 2008. Presumably there was a police photograph from then, and it seems like police didn't use that. But also, 47 days elapsed between the crime and the photo identification. Now, what that means is that police had time to build this photo array again around Mr. Lunsford's photo. They had time to investigate the eyewitness, find out that he was on parole in two states, after having been on the run for more than nine years. They found out that he moved a weapon from the crime scene. A weapon... The eyewitness or the shooter?  The eyewitness. You're talking about Keith or the shooter? The eyewitness removed a weapon from the crime scene. The weapon that was held by the shorter man, whereas the taller man has been tagged as the shooter. The eyewitness removed that weapon from the scene of the crime. Disposed of it in someone's backyard on a side street. Lied about it to police in his first statement the morning after. Then later that day, he told police, oh, I did actually move the gun. They went back to look for it, and of course it wasn't there anymore. And so, he was on parole in two states. His parole conditions made clear that committing any crime, possessing any weapon, possessing drugs, which were also found in his apartment there, are violations of his parole conditions. The bottom line is that this eyewitness was very suggestible and able to be influenced, which is another thing that detectives knew. But there's nothing there to show that they did that. I assume that the other photos were, whatever clean shaven means, whether it means no beard or... They didn't look like you, Judge McKee. If you say this is a neat beard, my wife would disagree with you. But did the other people in the photo spread have facial hair, put it that way? Again, it's difficult to tell because some of the photos are quite dark, even in the color copy that we received from the Attorney General's office. But if it's hard to tell for all of them, then you don't get anything that makes your client stand out. The one thing, if the shooter, there was evidence that suggested the shooter had a beard, be it a clean shaven beard or fuzz, and everybody else was really clean shaven with no hair at all, and they showed the photos spread, that's pretty blatantly suggestive. But it sounds like that's not here. And all the things that you're talking about in terms of Keaton, and when I read it, it seemed to me, from what I can tell, Keaton may have been the shooter, I don't know. But that's what you argue to the jury in closing argument. That's not grounds for, especially under Perry and under our case in Bozema, that's not grounds for habeas relief. Well, Your Honor, I believe that during the photo array, when Detective Shergani said, you recognize him, that's the most suggestive. But I believe... Was there a question, do you recognize him, or do you recognize him, or can you tell? So, in the transcript of the eyewitness ID, what it says is, you recognize him, question mark. What Detective Shergani said at trial is, I asked him, because he spent some time looking at it, I asked him, do you recognize him? So, in the record, we have two formulations of this, because you recognize him was also read into the record at trial during the eyewitnesses cross-examination. So those are both in the record. Now, we can talk about whether, and of course it would be a hypothetical, whether had Detective Shergani said, for the first photo, do you recognize him? Second photo, do you recognize him? Third photo, do you recognize him? That seems like it would be less suggestive, but even with all of the other circumstances surrounding this photo array, it seems like it would still be suggestive. Now, what actually happened during the photo array... Shergani didn't know that was him. Shergani did not know who the subject was. So, two things. First, the Supreme Court has said, suggestiveness can be intentional or unintentional. And it can manifest in a variety of subtle ways. Second, it doesn't matter, I would submit, that Shergani didn't know who it was, because what matters is the effect on the witness. Also, it's contrary to the boilerplate instructions that Shergani gave to the eyewitness. Take as much time as you need to look at the photos. So, we're dealing with a lot of hypotheticals here. Are you asking for relief, or are you asking for an evidentiary hearing, or both? So, we're asking for any alternative relief of an evidentiary hearing in the District Court, because Mr. Lunsford... I see my time is up. Okay, thank you. Because Mr. Lunsford was denied that opportunity in the District Court, and also in state PCR. He's never had an evidentiary hearing on these issues. But we believe that evidence is strong enough for the court to grant a writ in the first instance. Even taking into account the deferential posture you're in with respect to the state court findings? Yes, Your Honor. Just quickly, because the state court ignored all but one of the facts that I've talked about, the only fact that they mentioned in their opinion, it's the state court direct appeals opinion, is that the photo array took place 47 days after the crime. That's the only fact that they mentioned. And then they go to, well, two procedures that detectives used, comported with the New Jersey Attorney General guidelines. And then they say, so it wasn't suggested. So the court in no place actually examined, analyzed, considered anything that detectives did wrong here. Thank you. Is it Cooper Daub? Cooper Daub, Your Honor. Good morning. Good morning, Your Honors. May it please the Court. My name is William P. Cooper Daub, and I represent the respondents in this case. Your Honors, I think at first glance, this case can look a little complicated. But doing a proper analysis, applying the required habeas standards, it actually turns out to be fairly simple. And what we see is that the State Appellate Division, in applying and rejecting Mr. Lunsford's ineffective assistance of counsel and due process claims, reasonably applied the clearly established law on both ineffective assistance of counsel and on due process. And that's really, that's the end of the case, basically. Because that's the key question, is not whether, not simply was, was there an ineffective assistance of counsel, was there a problem with the ID, but did the Appellate Division reasonably apply that clearly established federal law? I would note, in this case, I think that applying that standard and applying it to the proper record is actually crucial. Because almost everything that Petitioners' Counsel have cited here and argued to you, before you today, was not before the Appellate Division when it considered this matter. So the transcript of the identification was not before the court. The photographs that they're relying on to make their argument about photo selection were not before the court. And the photographs in the record? They, so the photographs from the array are part of the record because they were admitted before the, they were admitted into evidence at trial. They were introduced as exhibits at trial. I'm sorry, I apologize. When I said the photographs, I was thinking of the photographs they had introduced in support of their argument that Mr. Lunsford had a beard during 2008. So they're pointing to the photo ID photo and the arrest photo that postdated the. Was the transcript of the second statement, the part before Detective Tregani took over, provided to Defense Counsel in discovery? Yes, because, in fact, Defense Counsel used it during cross-examination during trial. But Defense Counsel did not ever introduce that into evidence. What about the grand jury testimony? That was not introduced into evidence. Was it provided to Defense Counsel? Yes, I believe that he relied, I believe he relied on that at some point as well. You mentioned grand jury proceeding, but not specifically some of the contradictions about whether Mr. Kite had moved a weapon and so on. I mean, certainly that was, the fact that Mr. Kite had moved a weapon was a main focus of his arguments to the jury. So he was clearly well aware of that fact and dwelt on that a lot during this mission. Okay, so of the documents that you contend should not be in this record, is it true that most of them except for the 2018 arrest photographs and I guess probably the license photograph were provided to the defense in discovery? Yes, as far as I know. I mean, I don't have, I don't know that I have a distinct record of exactly what was handed over to discovery, but it certainly appears that all that was provided to the defense, based on the fact that he was citing and mentioning, he was discussing the police reports that they were asking to bring in and certainly this transcript. So yes, Your Honor. I should note even in terms of the statement, the question of Detective Chogany during the identification procedure is the one thing that comes close to being in, but even that, actually the way that came in was through a transcript where he explained, the trial transcript where he explained that question and said, well, I saw Mr. Akeet pause and look at this photograph and so I said, do you recognize this individual? So that's what was before the appellate division when they ruled on this. And it is crucial to this analysis because as explained in Colin P. Pinholster and many other cases, the question here when you're looking at did the state court reasonably apply clearly established federal law, you're looking at what did it apply it to? You're looking at the facts that were before it. And so it's not possible to really apply that analysis if we start adding in new facts and adding in, adding new things, pieces of evidence that weren't actually before that court. Was there any objection to the charge that was given in terms of how you evaluate to the jurist, how you evaluate a court identification? I don't believe there's any objection over it, no. And in fact, even though this, the trial was pre-Seminole, New Jersey case on identification, Henderson and pre-Perry and some of these other cases, it did still in fact go into many of these, basically went and explained the weight factors to the jurors in terms of helping them to evaluate the reliability of that identification consistent with the holding of Perry and Mintz and other cases, that reliability is really something for the jurors to decide unless there's some sort of impermissible suggestibility. So why should we not send it back for an evidentiary hearing? Well, Your Honor, I think that, among other reasons, that the petitioners really not made the necessary showing to have an evidentiary hearing in this case. I mean, both, I mean, in terms of, first of all, I mean, petitioner did not argue, make these exact arguments to the district court here. So, I mean, they were kind of criticizing the state courts for not analyzing this, for basically talking about the passage of time and about the fact that the identification complied with the New Jersey Attorney General guidelines on identifications. But it's not, this argument about suggestiveness of the procedure based on Detective Trugani's question and certainly based on any of these other things they're pointing to were never made to any state court, were never made to the district court. It was made to the jury? I'm sorry? That argument was not made to the jury? It was, the reliability arguments were made to the jury, but it was not argued to the jury that it was suggestive, I don't believe, but certainly was not made to the appellate division when this matter was addressed on its merits. Well, can you think of any strategic reason, as you know, we have to assume defense counsel acts in a way that is consistent with an informed judgment as to what's in his or her client's best interest. Can you think of any strategic reason for not asking for suppression hearing from that kind of fuller spread? I think at the most rudimentary level, I think that Roberts would have recognized this was essentially a meriless motion, a motion that would have been very unlikely to succeed given the standard established in Manson, and so why waste his time and the court's time with that? I think at a slightly more nuanced level, his whole argument to the jury and throughout the trial really relied a lot on pulling out these inconsistencies between what Mr. Keat had said to different officers at different times or what the officers had reported him saying to them at different times, so pulling out these different inconsistencies in Mr. Keat's statement. So I think there certainly could be that if he revealed all those inconsistencies in the suppression motion, that that would give the prosecution a chance to go back and try to get ahead of those and try to make sure they're on direct, they're eliciting explanations for, you know, why would he have said that? You know, is that really what he said? So certainly that would be kind of tipping the hand in terms of his trial strategy to lay out all those inconsistencies before the trial even got going. So it's pretty obvious what his trial strategy is going to be. Is there anything he's got to work with? Exactly, Your Honor. In terms of the question Detective Trugani asked, you know, I have to stress both he explained that was in response to a pause by Mr. Keat, and, you know, I know the pause isn't reflected in the transcript. I don't know, but I think it's usually clear that pauses are usually not really reflected in transcripts. But, you know, he explained that was what happened at trial. I would also just point out that this is a neutral question. He's saying do you recognize him in response to the witness's conduct? And also, of course, this was being done double blind. Detective Trugani explained on the stand he had no knowledge of this case. He didn't know who the suspect was, if there even was a suspect. So I don't think there can really be any hint that he was trying to influence Mr. Keat to select this photograph. And in terms of the sort of alleged confidence boosting by the detectives prior to the ID procedure, you know, that's in materials that were never before any court to consider this matter. I think, well, both. I mean, it would make sense for the detectives to try to confirm that Mr. Keat really believed he could identify someone, because, of course, detectives don't want witnesses going in and basically picking someone at random. They don't want to say just pick somebody, because if he picks the wrong person, which is five to one, he would pick the wrong person. That's suddenly Brady material. That's got to be disclosed. That's suddenly being used by the defense. If they bring Mr. Keat, well, they're saying, didn't you pick? You picked the wrong person. So another way to say that is a very, very good identification procedure. Just lay out six photos and say, take a look at these six and see whether he picks the wrong person. That would be a really, really good procedure if the right person gets picked out of that. You're saying that you don't want to just have the person go in and pick, look at some photos at random. Yes, you do. That's the whole purpose of it. Right. You don't want to encourage someone to pick if you don't think they really know. Well, unless you think that you've got the suspect in the group of six and you want to make darn sure the person is picked out of the forest road. But if. Well, sure. I see what you're saying. I guess I was just trying to say it wouldn't make sense for detectives out before the identification to encourage. By exploring whether they felt like he was confident in his ability to identify the suspect, that would make sense. I should say the perpetrator. That would make sense to them. In advance to try to make sure that he's not going to go in and pick someone at random because he feels pressured to because he's been brought in. So I hear you that it makes sense to explore that. But but I'm a little surprised to hear you have endorsed the type of questioning that the detectives were doing with Mr. Kite before the before he saw the array. I mean, these were really strong leading questions that that very much suggested the answer. You know, the detective said, oh, it was broad daylights. And he said it was, you know, it was perfect lighting somewhere. He said, I think he said, you can see his face perfectly. Nothing blocking your vision. You know, I mean, like he was he was really telling him that that he was likely to be able to to identify someone. And so, I mean, it seems that if if this were in the record, that that would be very problematic. I'm not sure. I mean, it is not in the record and was not before any prior court. I mean, I would stress this was not Mr. Kitt's first interview. He'd been in shortly after the shooting. So he'd already given a description of the shooter and talked about the circumstances of the shooting. And I think to some extent, their description of the interaction that happened was reflective of what he'd said during that August 2008 interview. What he described given a description of the shooter, which was consistent with my colleague is saying that negates everything that came later. When Kitt is told, we're not sure if the person is in the photo spread. You don't have to identify anybody. It negates all that because the person goes into the frame of mind. I got a really good look at this person, even though he clearly did not get a really good look at the person. And of course, the witness in a position where he believes that he can make an identification was all the circumstances here would suggest that he couldn't make an identification. It was got the stress of a gun, a split second view of the person's face on. I'm not sure what the lighting conditions were, but I recall they weren't optimal. All the circumstances would suggest he can't make an ID. We had the police officers telling him, you can make a good ID here. You were in a good opportunity to observe. I think that's Judge Freeman's concern. It's also my concern. I understand that, Your Honor. I mean, I would stress again that he had given a description of the perpetrator, which did end up being consistent with Mr. Lunsford at the end of the day. He does look like the guy. I think we all agree that Lunsford looks like the shooter. The issue is, is he the shooter? It's like when they bring in these composite sketches, and they then bring in the person who's arrested, and you look at the composite sketch and say, my goodness, gosh, that's a great sketch. Yeah, it's a great sketch. He was arrested because he looked like the sketch, not because he was the actual perpetrator. I understand what you're saying, I think, Your Honor. So was defense counsel provided with this transcript? Yes, defense counsel had this transcript because he used it while he was cross-examining, I believe, both Mr. Key and Detective Trugani. But notwithstanding having this transcript, he didn't pursue any sort of motion to suppress the identification? That's right, Your Honor. But, of course, what's key here, the real question here is not what Mr. Roberts had access to then. It's what the Appellate Division had before it when it resolved this claim on the merits. I get that. So the problem is we have to decide this case without considering that evidence. That's your position? Yes, absolutely. That is Respondent's position, is that these things were never before the state court that decided on the merits, so they can't function as part of the habeas. They can't contribute at all to a proper habeas analysis. The petitioner mentions, you know, dwelt some on the lapse of time between the crime here and the eventual I.D. and was kind of speculating about what could have gone on during that time. I would just point out, you know, Mr. Lunsford was placed in this array as a result of him becoming a suspect in another shooting. But, you know, that shooting happened at a later time, so it's not like this was being drawn out while they did other things. That other shooting occurred. I think they received information from someone who was familiar with Lunsford, you know, implicating him in that shooting. And then since that was, I think, a half mile away, you know, in the same neighborhood, and seemed to be a sort of similar MO, that they decided to make that, to include him in the I.D. and the array. And I don't think there's anything wrong with that procedure. Your Honors, I don't think I have anything else specifically I want to touch on, but I'm happy to take any other questions. No, thank you. All right. For all that, we'd simply ask this Court to affirm the district court's decision. Thank you very much. Your Honors, I would like to touch briefly on, I think, five or six points, if I can read my chicken scratch right. Why did you say they want to briefly make one point? Five or six points, we'll be here until then. I have a lot of things to say. Okay. So, first of all, regarding the record, this is not a matter of creating a new record in the federal court. This is not what Penn Holster was concerned with. This is a matter of conforming the record, correcting the record, to what was used at trial and what was available to the state court on direct appeal. Also, I will note that you asked about the jury instructions, Judge McKee. There was a charge to the jury about identification, of course. The trial court instructed the jury that it could consider whether anything suggestive was said to the witness prior to the viewing of the photo array. That gets to the suggestive and leading questions that Detective Diaz asked the eyewitness before showing him any photos. The jury actually requested that transcript, the transcript of the second statement, specifically after deliberating for only a little over an hour. Were they given the transcript? They were not because it had not been formally moved into evidence. But, I mean, that just shows that it could have been attached to the PCR petition that was filed in state court, and then it would have been in the record and available for the PCR appeal, PCR and appeal. I agree. And so could the photo array have been attached at every level of the actual photos? I think, aren't we, are our hands tied now that those materials were not presented? We don't have any kind of a, like, Martinez v. Ryan allegation here. Like, we're just, you know, we're just hearing the claim that was presented to the state court with the factual basis that was presented to the state court. So even the evidence that was before the state court on direct appeal, they had the prompt in the record before them. It was from the trial transcript. It was mentioned at least twice in the trial transcript. It was also mentioned in the defense briefing on direct appeal. The state court ignored that. The state court also didn't discuss hardly any reliability factors other than 47 days. And then they said the jury was the final arbiter. That's an unreasonable application of the principles in Strickland, Simmons, Wade, and Biggers. The photo array. The pictures in the photo array, they all look similar. Now, Mr. Lunsford's photo was old. That's not what he actually looked like in 2008. He had a full beard. So detectives matched it to the description. This is a case like Thomas where detectives emphasized two photos, said, look at them real good, and then the eyewitness identified someone. Unless there are further questions? Other than many thanks to you and your colleagues, is it Fagler, Fagley? Fagrey. Fagley, Fragy Drinker, and Deckard. Thank you very much for taking this case, Cora Bona. Well, thank you for the opportunity, Your Honors.